[No. B110185. Second Dist., Div. Two. Aug. 10, 1998.]

LLOYD DESIGN CORPORATION, Plaintiff and Appellant, v. MERCEDES-BENZ OF NORTH AMERICA, INC., et al., Defendants and Respondents.

718

**COUNSEL**

Ervin, Cohen & Jessup and Eliot G. Disner for Plaintiff and Appellant.

Brobeck, Phleger & Harrison, George A. Cumming, Jr., and Kent M. Roger for Defendants and Respondents.

## OPINION

**BOREN, P. J.**—A distributor in one of this state's most competitive fields —automobile sales—decided to include floor mats as standard equipment in its vehicles to compete with other car manufacturers which offer standard floor mats and to satisfy a perceived consumer demand for increasing levels of comfort and convenience in new automobiles. A floor mat manufacturer sued under the Cartwright Act, claiming that it was financially damaged because floor mats did not remain an optional accessory. We find no violation of California antitrust law and affirm the judgment in favor of the car distributor.

### FACTS

Respondent Mercedes-Benz of North America, Inc. (Mercedes) sells luxury vehicles in the United States. Its sales represent less than 1 percent of all automobile sales in this country. Among luxury cars, Mercedes holds about a 10 percent market share.

Appellant Lloyd Design Corporation (Lloyd) manufactures and sells accessory floor mats for vehicles. Lloyd makes about 3,000,000 different combinations of floor mats. Lloyd sells floor mats to some Mercedes dealerships which, in turn, sell the mats to consumers. Because floor mats were optional accessories in Mercedes vehicles until 1995, there was a competitive business amounting to some $250,000 in new car floor mat sales to Mercedes dealerships in California.[1]

Beginning in model year 1996, Mercedes decided to make floor mats standard equipment after the Mercedes National Dealer Council met and urged the company to make this change because "luxury car customers expect this" and because a growing number of competitors offer this standard feature.[2] The cars are delivered by Mercedes to the dealerships with the mats already in the car trunk, ready for placement.

Mercedes does not manufacture floor mats itself. Rather, it purchases mats from suppliers which compete with each other to manufacture and sell mats to Mercedes. Lloyd is not precluded from bidding for a floor mat contract

---

[1]According to Lloyd, six different companies in the United States compete with each other to manufacture and sell floor mats for Mercedes vehicles.

[2]A 1994 study by Mercedes showed that among "select" (i.e., premium) car manufacturers floor mats are standard equipment on Audis, Cadillacs, Infinitis, Jaguars (some models), Lincolns, Saabs and Volvos. Mats are "dealer installed" on Acuras, BMW's and Lexuses. Only Porsche still treats mats as optional equipment, among luxury carmakers.

with Mercedes. Mercedes chose not to use Lloyd as a supplier because Lloyd's mats lack a heel pad, no price advantage was offered, and Lloyd uses a cutting process that is too slow for Mercedes's needs. Mercedes has not received a bid proposal from Lloyd since 1991. Mercedes dealerships continue to purchase floor mats from Lloyd for customers who need to replace their car mats.

The cost of floor mats is included in the base price of Mercedes vehicles. Mercedes dealerships are not charged separately for the mats. Mercedes's decision to include the car mats did not cause the base price of their vehicles to rise. On the contrary, Mercedes decreased the sticker price on most models while including extra standard equipment such as floor mats and cupholders. Now that the mats are in the car when it is delivered, the dealers are relieved of the cost of stocking a large inventory of floor mats and need not be concerned that a new car customer will demand a mat which is out of stock.

In September of 1995, Lloyd filed suit against Mercedes claiming that the decision to deliver the cars with floor mats constituted an illegal tying arrangement between Mercedes automobiles and floor mats in violation of the Cartwright Act.[3] Mercedes brought a motion for summary judgment. The trial court granted the motion and entered judgment in favor of Mercedes and codefendant Caliber Motors, Inc. Lloyd appeals from the judgment.

DISCUSSION

## I. Cartwright Act Claim

Lloyd alleges a violation of Business and Professions Code section 16727, an antitrust statute falling within the Cartwright Act.[4]  ■  "The purpose of the Cartwright Act is to protect and foster competition by preventing combinations and conspiracies which unreasonably restrain trade." (*Morrison* v. *Viacom, Inc.* (1997) 52 Cal.App.4th 1514, 1524 [61 Cal.Rptr.2d 544].)

---

[3]Lloyd later added as a defendant one Mercedes dealership, respondent Caliber Motors, Inc. Lloyd makes no argument on appeal with respect to its claims against Caliber Motors, thereby waiving any claim of error in the trial court's judgment in favor of Caliber.

[4]Business and Professions Code section 16727 reads, "It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

Section 16727 is based on a federal equivalent, hence federal decisions are applicable when interpreting the Cartwright Act. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 853 [94 Cal.Rptr. 785, 484 P.2d 953].)

■ Business and Professions Code section 16727 prohibits illegal tying arrangements. A tying arrangement is " 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying arrangements serve hardly any purpose beyond the suppression of competition." [Citation.] They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power of leverage in another market. At the same time buyers are forced to forego their free choice between competing products. . . .' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc., supra,* 4 Cal.3d at p. 856; *Eastman Kodak Co.* v. *Image Technical Services, Inc.* (1992) 504 U.S. 451, 464, fn. 9 [112 S.Ct. 2072, 2081, 119 L.Ed.2d 265].)

"Tying arrangements are illegal per se if the party has sufficient economic power and substantially forecloses competition in the relevant market. [Citation.] Even when not per se illegal, a tying arrangement violates the Cartwright Act if it unreasonably restrains trade." (*Morrison* v. *Viacom, Inc., supra,* 52 Cal.App.4th at p. 1524.) On the other hand, the Cartwright Act is not intended to dictate what price a company might charge for its goods: the problem arises when the company is "conditioning the consumer's *access* to a product or service on his or her relinquishment of the freedom to choose *whether* to purchase another product or service." (*Id.* at p. 1525.) In other words, the seller cannot force its customers to accept one product or service in order to obtain another. (*Ibid.*)

■ We see no illegal tying arrangement in this case. Consumers are not "forced" to purchase a Mercedes with standard floor mats any more than they are "forced" to purchase a Lexus with a standard antitheft device or a Volvo with standard side-impact air bags. This is especially true given that Mercedes controls less than 1 percent of the total car/light truck market in the United States, and only 10 percent of the luxury car market. A wide variety of car makes, models and price is available to consumers with an equally wide variety of standard equipment.

Nor can it be said that Mercedes is making a gambit to dominate the floor mat business: Mercedes is a *purchaser* of floor mats, not a manufacturer of floor mats. The company's economic self-interest lies in encouraging competition among floor mat manufacturers in order to obtain a better product at a lower price. Thus, Lloyd's entire premise that "competition in floor mats for new Mercedes vehicles has been eliminated" is fallacious. There is no restraint of commerce in floor mats. The competition continues, only now floor mat manufacturers are competing against each other to supply Mercedes instead of competing to supply individual Mercedes dealerships.

Once the floor mats are placed in the car by the manufacturer or its distributor, they become part of the car, just as the seats, stereo system, antitheft device and so on become part of the car once they are installed.[5] If we accept Lloyd's argument that the floor mats and the car are two separate products, the only "standard" equipment on cars would be the chassis, engine and body: Car seat, vanity mirror and steering wheel manufacturers (among others) would be claiming that their products come in all different shapes, sizes and colors and should therefore be separate product options left up to the consumer. Such a scenario—far from benefiting consumers—would make car buying a more exasperating experience than it already is.

Acknowledging that consumers are no more forced to buy Mercedes vehicles with standard floor mats than they are to buy Cadillacs or Infinitis with floor mats, Lloyd has recast the scenario by claiming that Mercedes *dealers* as opposed to actual consumers are "forced" to accept delivery of Mercedes vehicles with standard floor mats or risk losing their dealerships if they refuse to accept the cars as delivered. The dealerships would prefer, Lloyd insists, to choose their own floor mats. This is absurd. Mercedes dealers must also accept all the other standard equipment and aspects of the vehicles manufactured by the company whose product they have chosen to sell, from the colors the company chooses to paint its cars, to the climate-control system, to the design of the headlights, to the placement of the parking brake (hand brake versus foot brake), and so on.[6] If each dealership were entitled to dictate to Mercedes how to manufacture and equip its cars, the company would promptly go out of business.

---

[5]There is no basis in law or reason to conclude that one part of a new car is a separate product merely because that part is easier to remove than another part of the car. With varying degrees of facility, all parts of a car may be removed or replaced. Nevertheless, when all the parts are packaged together to form a new car, it is one product.

[6]"To MBNA it is crucial that a dealer operating under a franchise distribution arrangement offer standardized products. Only then can customers confidently rely on the Mercedes name." (*Mozart Co.* v. *Mercedes-Benz of North America, Inc.* (9th Cir. 1987) 833 F.2d 1342, 1349.) "In a franchise relationship, the franchisee presumably accepts the burdens of the arrangement to reap some benefits" such as institutional advertising, marketing support, and

Thus, Lloyd's focus on the plight of Mercedes dealers who are forced to sell cars with standard floor mats is misplaced. "[A] franchisor's ability to 'coerce' its franchisee does not show market power and does not invoke antitrust concerns. . . . [¶] The franchisees' 'lock in' . . . results from a business relationship of their choosing, the franchise, whose terms were freely entered into by both parties." (*Exxon Corp.* v. *Superior Court, supra,* 51 Cal.App.4th at p. 1686.)

A Mercedes purchaser who is dissatisfied with the quality of nonessential standard items (such as the paint color, or the sound system, or the tire rims, or the floor mats) can easily arrange to have the car customized at the consumer's own expense or attempt to negotiate a credit or a price reduction from the dealer. Most consumers, however, would prefer to have as much standard equipment as possible on the car: it is well known that "options" drive up the price of a new car substantially. We do not see why consumers should be deprived of a complete standard equipment package just because a handful of dealers wished that the equipment were of better quality or a different color.

■ As the Supreme Court has observed, "not every refusal to sell two products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts. . . . Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively . . . ." (*Jefferson Parish Hospital Dist. No. 2* v. *Hyde* (1984) 466 U.S. 2, 11-12 [104 S.Ct. 1551, 1558, 80 L.Ed.2d 2].)

The restraint of trade argument advanced by Lloyd has been thoroughly considered and rejected by the Third Circuit Court of Appeals, en banc, in a case involving Chrysler's decision to make auto sound systems standard equipment. (*Town Sound and Custom Tops* v. *Chrysler Motors* (3d Cir. 1992) 959 F.2d 468.)[7] Before the 1980's, sound systems were an option on Chrysler vehicles. After Chrysler decided to provide sound systems as

so on. (*Exxon Corp.* v. *Superior Court* (1997) 51 Cal.App.4th 1672, 1684 [60 Cal.Rptr.2d 195].)

[7]Evidently aware that the *Town Sound* opinion is fatal to its claims, Lloyd argues that the opinion has been supplanted by *Eastman Kodak Co.* v. *Image Technical Services, Inc., supra,* 504 U.S. 451. The facts of the *Kodak* case are entirely distinguishable from *Town Sound* and the case at bench. Kodak, which controlled 100 percent of the parts market for its photocopiers, attempted to monopolize photocopier repairs by refusing to supply replacement parts to independent copier repair companies, thereby forcing consumers who were already "locked

standard equipment included in its vehicles' base price, it was sued by a group of independent auto sound dealers, claiming that this was an illegal restraint of trade and tie-in which forced consumers to accept inferior and over-priced Chrysler-supplied stereos. (*Id.* at p. 471.)

The Third Circuit disposed of the two theories advanced by the auto sound dealers, observing that the relevant antitrust consideration was whether *consumers* were hurt, *not* whether independent auto sound dealers would eventually be "doomed to competitive oblivion." (959 F.2d at p. 495, fn. 40.)[8] First, the court found there was no violation "per se" of the antitrust laws because Chrysler—with 10 to 12 percent of the new car market—lacks sufficient market power to force or coerce the objected-to tied-in sale. (*Id.* at pp. 475-481.) The court rejected the notion that the relevant tying product market consisted only of new Chrysler cars manufactured for sale in this country and instead concluded that "[t]he relevant product market includes Chrysler cars *and* cars that are reasonably interchangeable with Chrysler cars." (*Id* at p. 480.) Second, the court concluded that under the "rule of reason," the auto sound dealers could not prevail because there was no injury of the type the antitrust laws were designed to prevent. The court reasoned that the market for automobiles is so competitive that any manufacturer with a substandard package of performance, color, styling, sound system, etc., will find consumers either buying their cars from competitors or demanding a lower price for the car given its less desirable features. (*Id.* at pp. 481-494.)

The same reasoning applies here. Mercedes—with a minuscule share of the total new car market and only a small share of the new luxury car market—does not have sufficient market power to force a tie-in arrangement. Lloyd's attempt to avoid defeat by pleading that the relevant product market is "custom floor mats sold to Mercedes dealers for new cars" is unavailing. The product market is not confined to Mercedes or floor mats, as neither product is unique but rather is one choice among many. (See *Exxon Corp.* v. *Superior Court, supra*, 51 Cal.App.4th at p. 1686, fn. 7; *Muenster Butane, Inc.* v. *Stewart Co.* (5th Cir. 1981) 651 F.2d 292, 296.) "Put more

in" to have their broken copiers serviced by Kodak and Kodak alone. An analogy to *Kodak* might be drawn if Mercedes were refusing to supply otherwise unobtainable Mercedes replacement parts to independent car repair shops in order to force consumers to have their cars repaired at Mercedes dealerships. That is not remotely what this case is about. Consumers factor in the quality of the standard floor mats *before* they purchase the car or are "locked in."

[8]Otherwise stated, the antitrust laws are intended to protect the competitive process, not to protect individual competitors. (*Atlantic Richfield Co.* v. *USA Petroleum Co.* (1990) 495 U.S. 328, 342-345 [110 S.Ct. 1884, 1893-1895, 109 L.Ed.2d 333].)

simply, a market . . . includes actual or potential competitors who may take business away from each other." (*Town Sound and Custom Tops* v. *Chrysler Motors, supra*, 959 F.2d at p. 480.) There is significant competition in cars and car floor mats that is not substantially lessened or otherwise restrained by Mercedes's decision to purchase floor mats from suppliers rather than leaving that decision up to car buyers.[9] The continued competitiveness of the automobile industry has protected and benefited consumers who can take advantage of the profusion of car choices to bargain for better designed, standard equipment-filled vehicles at optimum prices.

At base, the problem here is not that consumers or dealers are forced to accept Mercedes vehicles with standard floor mats. On the contrary, the evidence shows that consumers and retailers benefited when Mercedes began to include floor mats as standard equipment at a *lower* base price than was previously charged. Rather, the "problem" which Lloyd refuses to acknowledge is that Mercedes is presently using one or more of Lloyd's competitors as its floor mat supplier. This is not a "problem"; it is the marketplace in action. If Lloyd devises a way to manufacture a floor mat which is of better quality and a lower price than its competitors' mats, it will be able to sell Mercedes floor mats on a more substantial scale than ever before. Lloyd's present inability to offer Mercedes better service, product and price than other floor mat manufacturers cannot be resolved by invoking the Cartwright Act or resorting to the courts.

There is, in short, no evidence to support a claim that Mercedes's decision to include floor mats as standard equipment in its new vehicles "substantially lessen[s] competition or tend[s] to create a monopoly" in this state's commerce. (Bus. & Prof. Code, § 16727.) Summary judgment was properly granted as a matter of law. (*Tibor* v. *Superior Court* (1997) 52 Cal.App.4th 1359, 1368-1369 [61 Cal.Rptr.2d 326].)

II. *Discovery Issue*

Lloyd argues that the judgment below should be reversed because Mercedes failed to timely provide discovery. Lloyd failed, however, to make a showing that a continuance of the summary judgment motion was needed in order to compel production of the information it now claims was central to its case. (Code Civ. Proc., § 437c, subd. (h); Super. Ct. L.A. County Rules, rule 9.21(g).)

---

[9]See *Suburban Mobile Homes, Inc.* v. *AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 549 [161 Cal.Rptr. 811], suggesting that the existence of a tying arrangement may be established "if a not insubstantial volume of commerce in the tied product is restrained." We need not analyze the correctness of the dicta in *Suburban* in light of our conclusion that there are not two separate tied products in the present case.

Lloyd failed to file a motion for a continuance supported by the necessary declarations and proof and thus waives its right to claim now that it was deprived of the opportunity to oppose the motion for summary judgment. (*Lewinter* v. *Genmar Industries, Inc.* (1994) 26 Cal.App.4th 1214, 1224 [32 Cal.Rptr.2d 305].) Indeed, Lloyd's opposition to the motion for summary judgment informed the trial court that "The showing made by Lloyd here should be more than enough to permit it to now proceed to trial, even without it now having the significant discovery that defendants still cavalierly deny it." By indicating that the court had "more than enough" evidence before it to sustain a ruling in Lloyd's favor, Lloyd gave the trial court sufficient reason not to continue the motion for the purposes of allowing further discovery.

### DISPOSITION

The judgment is affirmed.

Fukuto, J., and Zebrowski, J., concurred.

A petition for a rehearing was denied September 1, 1998, and appellant's petition for review by the Supreme Court was denied November 18, 1998.